## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE HENRY FORD HEALTH SYSTEM DATA SECURITY LITIGATION | Master File No.: 2:23-cv-11736-GAD-KGA<br><br>Hon. Gershwin A. Drain<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Briana Tabbs, Latricia Pelt, Brandi McKenzie, and David King ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Henry Ford Health System ("Defendant" or "HFHS"). Plaintiffs seek to obtain damages, restitution, and injunctive relief for the Class, as defined below, from HFHS. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

1.     This class action arises out of the recent targeted cyberattack and data breach on HFHS's network that resulted in unauthorized access to highly sensitive patient health information and personal data ("the Data Breach"). Plaintiffs bring this class action against HFHS for its failure to secure and safeguard their and

1

approximately 168,000 other individuals' personally identifiable information ("PII")
and personal health information ("PHI") (collectively, "Private Information" or
"PII/PHI"). HFHS concedes that the PHI and PII potentially accessed in the data
breach includes: "name, gender, date of birth, age, lab results, procedure type,
diagnosis, date of service, telephone number, medical record number and/or internal
tracking number."[1]

2.      As a result, Plaintiffs and Class Members suffered ascertainable losses
in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and
the value of their time reasonably incurred to remedy or mitigate the effects of the
attack, emotional distress, and the imminent risk of future harm caused by the
compromise of their sensitive personal information.

3.      HFHS, one of the largest health systems in Michigan, "is one of the
nation's leading academic medical centers," and "is consistently ranked among the
top NIH institutions in Michigan."[2] HFHS "provides a full continuum of services –
from primary and preventative care, to complex and specialty care, health insurance,
a full suite of home health offerings, virtual care, pharmacy, eye care and other
healthcare retail."[3] HFHS "serves a growing number of customers across 250+

---

[1] *See* notice of data breach (Ex. 1 to Complaint, ECF No. 1-1, PageID.58; *see, e.g.*:
No. 2:23-cv-11758 PageID.117 & PageID.119) (hereinafter, "Notice").
[2] *See* HFHS *about* page (2:23-cv-11758 PageID.2 at n.2).
[3] *Id.*

locations throughout Michigan including five acute care hospitals, two destination facilities for complex cancer and orthopedic and sports medicine care, three behavioral health facilities, primary care and urgent care centers."[4]

4.      As a condition of receiving treatment or services, HFHS's patients are required to provide and entrust HFHS with sensitive and private information, including PII and PHI.

5.      According to HFHS, on or around March 30, 2023, its systems were subject to a cyberattack via an email phishing scheme, whereby an unauthorized individual or individuals were able to access HFHS's business email accounts. HFHS reports that patient information was exposed in the compromised mailboxes and confirmed internally on May 16, 2023, that "protected health information was contained" in the compromised email boxes. *See* Notice.

6.      HFHS further stated that the compromised information "may have included the following: name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number." *See id.*

7.      On or around June 6, 2023, HFHS reported the Data Breach to the U.S. Department of Health and Human Services Office for Civil Rights ("OCR"),

---

[4] *Id.*

reporting a "Hacking/IT" incident with its emails systems and that 500 individuals were impacted.[5]

8.      However, on or around July 17, 2023, HFHS admitted that approximately 168,000 individuals were actually impacted by the Data Breach.[6]

9.      Despite being aware of the Data Breach since at least May 16, 2023, HFHS did not post a notification on its website announcing the Data Breach until on or around July 14, 2023 and began sending notifications to impacted individuals on or around that time. *See* Notice.

10.      HFHS's Notice provided scant detail, particularly considering the size and scope of the Data Breach and the sensitivity of Plaintiffs' and Class Members' compromised PHI and PII. *See id.* HFHS's Notice states, in relevant part, that "an unauthorized individual conducted an email phishing scheme to gain access to business email accounts" and that "the improper access was quickly discovered and the email accounts were secured." *Id.*

11.      HFHS stated that "the incident occurred on March 30, 2023" and that it "immediately began an extensive investigation to determine what happened." *Id.*

---

[5] *See* Case No. 2:23-cv-11758 PageID.4 at n.5.
[6] *Id.*

4

12.     HFHS went on to state that "through our forensics investigation" HFHS "determined on May 16, 2023 that protected health information was contained in the email boxes and could have been accessed by the bad actor." *Id.*

13.     Thus, HFHS discovered that this Data Breach may have impacted protected health information ("PHI") or personally identifiable information ("PII"), such as "name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number medical record number and/or internal tracking number." *Id.*

14.     HFHS's Notice did not disclose how it discovered the cybersecurity attack, how the phishing scheme was detected and terminated, the means and mechanisms of the cybersecurity attack, the reason for its two-month delay in notifying Plaintiffs and the Class of the Data Breach after learning that Private Information was impacted, and, importantly, what steps HFHS took following the Data Breach to secure its systems and prevent future cyberattacks. *See id.*

15.     HFHS reported that the scope of information involved was vast— including name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number medical record number and/or internal tracking number. *See id.*

16. HFHS's Notice provided minimal assistance to impacted individuals, merely offering the number of a call center "that specializes in providing assistance for data security and cybersecurity incidents and services for other industries." *Id.*

17. The Data Breach was a direct result of HFHS's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' PII and PHI from the foreseeable threat of a cyberattack.

18. By taking possession and control of Plaintiff's and Class Members' PHI and PII for its own pecuniary benefit, HFHS assumed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' PHI and PII against unauthorized access and disclosure.

19. HFHS also had a duty to adequately safeguard this PHI and PII under industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act ("FTC Act"). HFHS breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' and other individuals' PHI and PII from unauthorized access and disclosure.

20. The exposure of a person's PII and PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of

identity theft crimes compared to the rest of the population, potentially for the rest of their lives.

21.     As a result of the Data Breach, Plaintiffs and Class Members are at imminent and substantial risk of experiencing various types of misuse of their Private Information in the coming years, including but not limited to, unauthorized access to email accounts, tax fraud, and identity theft—including medical identity theft.

22.     Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take several additional prophylactic measures.

23.     There has been no assurance offered by HFHS that all impacted PHI and PII, and any copies thereof, have been recovered, or destroyed.

24.     As a result of HFHS's inadequate security and breach of its duties and obligations, the Data Breach occurred, Plaintiffs and over 168,000 Class Members, suffered injury and ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, emotional distress, and the present and imminent risk

of fraud and identity theft caused by the compromise of their sensitive personal information.

25.    Plaintiffs' and Class Members' sensitive PHI and PII—which was entrusted to HFHS, its officials, and its agents—was compromised and unlawfully accessed due to the Data Breach.

26.    The injury to Plaintiffs and Class Members was compounded by the fact that HFHS did not notify patients and other individuals that their PHI and PII was subject to unauthorized access and exfiltration until on or around July 14, 2023, three-and-a-half months after the Data Breach was discovered and two months after determining that the Data Breach permitted access to protected health information.

27.    HFHS's failure to timely notify the victims of its Data Breach meant that Plaintiffs and Class Members were unable to take affirmative measures to prevent or mitigate the resulting harm.

28.    Despite having been accessed and exfiltrated by unauthorized bad actor(s), Plaintiffs' and Class Members' sensitive and confidential PHI and PII still remains in the possession of HFHS. Absent additional safeguards and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

29.    HFHS disregarded the rights of Plaintiffs and Class Members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems

were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard PII/PHI of patients and other individuals; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiffs and Class Members prompt and adequate notice of the Data Breach.

30.     In addition, HFHS and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had HFHS properly monitored these electronic systems, it would have discovered the intrusion sooner or prevented it altogether.

31.     The security of Plaintiffs' and Class Members' identities is now at risk because of HFHS's wrongful conduct as the Private Information that HFHS collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

32.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to actual fraud and identity theft as well as a heightened and imminent risk of fraud and identity theft.

33.     Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against further fraud and identity theft.

34.     Plaintiffs and Class Members may also incur out of pocket costs for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

35.     Plaintiffs and Class Members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft.

36.     Due to the fact that the affected email accounts contained protected health information and other immutable personal details, Plaintiffs and Class Members will be at risk of identity theft and fraud that will persist throughout the rest of their lives.

37.     Plaintiffs bring this action on behalf of themselves and individuals in the United States whose Private Information was exposed as a result of the Data Breach, which occurred on or about March 30, 2023, and which HFHS only first publicly acknowledged on or about July 14, 2023.

38.     Plaintiffs and Class Members seek to hold HFHS responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiffs seeks to remedy the harms resulting from the Data Breach on behalf of themselves and all similarly situated individuals whose Private Information was accessed and exfiltrated during the Data Breach.

39.     Plaintiffs thus seek remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and declaratory and injunctive relief including, but not limited to, improvements to HFHS's data security systems, future annual audits, and adequate credit monitoring services funded by HFHS.

## THE PARTIES

### Plaintiffs

40.     Plaintiff Briana Tabbs is a resident and citizen of the city of Warren in the State of Michigan. Plaintiff provided her PII and PHI to HFHS for many years beginning in or around 2012 in exchange for medical services.

41.     Plaintiff Latricia Pelt is a resident and citizen of the city of Detroit in the State of Michigan. Plaintiff provided her PII and PHI to HFHS in exchange for medical services during her time as a patient with HFHS over roughly the last twenty years.

42.     Plaintiff Brandi McKenzie is a resident and citizen of the city of Farmington Hills in the State of Michigan. Plaintiff has provided her PII and PHI to HFHS in exchange for medical services during her time as a patient with HFHS over roughly the last decade.

43.     Plaintiff David King is a resident and citizen of the city of Canton in the State of Michigan. Plaintiff King has provided his PII and PHI to HFHS in

exchange for medical services during his time as a patient with HFHS over roughly the last five years.

**Defendant**

44.     Defendant HFHS is a Michigan Corporation with its principal place of business located at One Ford Place, Detroit, Michigan 48202.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more class members; (b) at least one class member is a citizen of a state that is diverse from HFHS; and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

46.     This Court has personal jurisdiction over the defendant named in this action because HFHS is headquartered in this District and HFHS conducts substantial business in Michigan and this District through its headquarters, offices, parents, and affiliates.

47.     Venue is proper in this District under 28 U.S.C. §1391(b) because HFHS and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### HFHS's Business

40.    HFHS employs 33,000 people, and "serves a growing number of customers across 250+ locations throughout Michigan including five acute care hospitals, two destination facilities for complex cancer and orthopedics and sports medicine care, three behavioral health facilities, primary care and urgent care centers."[7] Due to the nature of these the services it provides, HFHS acquires and electronically stores patients' Private Information. As a healthcare provider, HFHS is required to ensure that Private Information is not disclosed or disseminated to unauthorized third parties without its patients' express written consent.

41.    Plaintiffs and Class Members are current or former patients who provided their Private Information to HFHS.

42.    To obtain medical services, patients—including Plaintiffs and Class Members—were required to provide sensitive and confidential Private Information, including their names, genders, dates of birth, ages, telephone numbers, and other sensitive information, including medical information, which would be held by HFHS in its computer systems.

43.    The information held by HFHS at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

---

[7] *See* n.2, *supra*.

44.     Upon information and belief, HFHS made promises and representations to its patients that the Private Information collected would be kept safe and confidential, the privacy of that information would be maintained, and HFHS would delete any sensitive information after it was no longer required to maintain it.

45.     Indeed, HFHS's own Notice of Privacy Practices acknowledges that it is "required by HIPAA to make sure that medical information that identifies you is kept private . . . and to follow the terms of the Notice that is currently in effect."[8]

46.     The Notice of Privacy Practices further provides that "[a]s permitted by HIPAA and Michigan State law, we may use or disclose your medical information without obtaining prior authorization from you to carry out the activities detailed below"—but those "activities" do not encompass the Data Breach.[9]

47.     HFHS's "Privacy Fact Sheet" identifies "[t]ypes of security threats faced today by health care providers," which include "[h]acker and disgruntled employee abuse."[10]

48.     Plaintiffs and Class Members provided their Private Information to HFHS with the reasonable expectation and mutual understanding that HFHS would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[8] Complaint, PageID.8 at n.4.
[9] *Id.*
[10] *Id.* at n.6.

49.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

50.     Plaintiffs and Class Members relied on the sophistication of HFHS to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information.

51.     Plaintiffs and Class members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

52.     HFHS had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties.

53.     HFHS has a legal duty to keep Patients' Private Information safe and confidential.

54.     HFHS had obligations under the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

55.     HFHS derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, HFHS could not perform the services it provides.

56.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs'

and Class Members' Private Information, HFHS assumed legal and equitable duties

and knew or should have known that it was responsible for protecting Plaintiffs' and

Class Members' Private Information from disclosure.

**The Data Breach**

57.     On or about July 14, 2023, Defendant began notifying patients of the

Data Breach, informing them in a manner consistent with the below:

> This Letter is being sent to notify you about a business email
> compromise incident that has occurred at Henry Ford Health. An
> unauthorized individual conducted an email phishing scheme to gain
> access to three employees' business email accounts. The improper
> access was quickly discovered and the email accounts were secured.
>
> Here are important facts for you to know:
>
> • Some of patient information was contained in the affected
> email boxes, but we don't know whether such information was
> actually accessed or not.
> • Phishing email schemes are used to fraudulently obtain
> victims' credentials or personal information by sending them
> fake email messages.
>
> . . .
>
> The incident occurred on March 30, 2023 and we immediately began
> an extensive investigation to determine what happened. Through our
> forensics investigation, we determined on May 16, 2023 that protected
> health information was contained in the email boxes and could have
> been accessed by the bad actor. . . .
>
> The information stored on the affected email accounts may have
> included the following: name, gender, date of birth, age, lab results,

procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number.

As a result of this incident, we are implementing additional security measures and providing additional training to employees about recognizing the signs of suspicious email and what to do if they receive one.

If there are questions, please call our Incident Response Line at **833-627-2685 between 9 a.m. and 9 p.m. Eastern Time, Monday - Friday.** That number goes to our business partner, Epiq Solutions, a call center based in Portland, Oregon that specializes in providing assistance for data security and cybersecurity incidents and services for other industries.[11]

58.     HFHS did not use reasonable security procedures and practices appropriate to the nature of the sensitive information that it maintained, such as encrypting the information or deleting it when it was no longer needed, causing the exposure of Private Information.

59.     The attacker accessed and acquired files in HFHS's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including their names, genders, dates of birth, ages, lab results, procedure types, diagnoses, dates of service, telephone numbers, medical record numbers and/or internal tracking numbers. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

---

[11]  Notice.

60.    Plaintiffs further believe their Private Information, and that of Class Members, was subsequently sold on the dark web following the Data Breach, which is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' Private Information

61.    As a condition of obtaining medical services from HFHS, Plaintiffs and Class Members were required to give their sensitive and confidential Private Information to HFHS.

62.    HFHS retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiffs' and Class Members' Private Information, HFHS would be unable to perform its services.

63.    By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, HFHS assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

64.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on HFHS to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

65.    HFHS could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members, and by providing proper training to its employees.

66.    Upon information and belief, HFHS made promises to Plaintiffs and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

67.    HFHS's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**HFHS Knew or Should Have Known of the Risk of a Cyber Attack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable to Cyber Attacks**

68.    Data thieves regularly target entities in the healthcare industry like HFHS due to the highly sensitive information that they maintain.

69.    HFHS knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

70.    HFHS's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities like HFHS that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

71.     In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), HFHS knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

72.     Indeed, in December 2017, HFHS disclosed a data breach involving the PHI of nearly 20,000 patients after "[s]omeone gained access to or stole the e-mail credentials of a group of employees."[12]

73.     Of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7%, were in the medical or healthcare industry.[13]

74.     The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[14]

75.     Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest

---

[12]  *See* Case No. 2:23-cv-11796 PageID.10 at n.14.
[13]  *See id.* at n.15.
[14]  *See id.*

rate of exposure per breach.[15] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[16] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[17]

76.     Despite the prevalence of public announcements of data breach and data security compromises, HFHS failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

77.     HFHS was, or should have been, fully aware of the unique type and the significant volume of data on HFHS's server(s), amounting to over one million individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[15] *See id.*, PageID.11 at n.17.

[16] *Id.* at n.18.

[17] *See id.*

78.     The injuries to Plaintiffs and Class Members were directly and proximately caused by HFHS's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

79.     The ramifications of HFHS's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

80.     As a healthcare entity in possession of its Patients' Private Information, HFHS knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs and time and opportunity costs imposed on Plaintiffs and Class Members because of a breach. Nevertheless, HFHS failed to take adequate cybersecurity measures to prevent the Data Breach.

**HFHS Fails to Comply with FTC Guidelines**

81.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

82.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[18]

83.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

84.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[18]  *See id.*, PageID.13 at n.20.

[19]  *Id.*

85.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86.    These FTC enforcement actions include actions against healthcare entities, like HFHS. *See, e.g.*, *In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

87.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as HFHS, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of HFHS's duty in this regard.

88.    HFHS failed to properly implement basic data security practices.

89.    HFHS's failure to employ reasonable and appropriate measures to protect against unauthorized access to Patients' Private Information or to comply

with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

90.     Upon information and belief, HFHS was at all times fully aware of its obligation to protect the Private Information of its patients; HFHS was also aware of the significant repercussions that would result from its failure to do so. Accordingly, HFHS's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### HFHS Fails to Comply With HIPAA Guidelines

91.     HFHS is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

92.     HFHS is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

93.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

94.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

95.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

96.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

97.     HIPAA's Security Rule requires HFHS to do the following:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;
   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
   c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
   d. Ensure compliance by its workforce.

98.     HIPAA also requires HFHS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and

26

appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

99.     Additionally, HFHS is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

100.    HIPAA and HITECH also obligate HFHS to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

101.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

102.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

103.   HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[20] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[21]

## HFHS Breached the Duty It Owed Plaintiffs and Class Members to Safeguard Their Private Information

104.   In addition to its obligations under federal and state laws, HFHS owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by

---

[20]  *Id.*, PageID.17 at n.23.
[21]  *Id.* at n.24.

unauthorized persons. HFHS owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

105.   HFHS owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

106.   HFHS owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

107.   HFHS owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

108.   HFHS owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

109.   HFHS owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

110.   HFHS breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and

safeguard its computer systems and data. HFHS's unlawful conduct includes, but is

not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to detect unauthorized ingress into its systems;

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

h. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

i. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

k. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

l. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

m. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

n. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules

regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

o.  Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

p.  Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

q.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

r.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

s.  Failing to adhere to industry standards for cybersecurity as discussed above; and

t.  Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

111.  HFHS negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

112.  Had HFHS remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, HFHS could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

113. However, due to HFHS's failures, Plaintiffs and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members also lost the benefit of the bargain they made with HFHS.

**The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft**

114. The unencrypted Private Information of Plaintiffs and Class Members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of hackers.

115. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members.

116. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

117. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

118. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used

and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

### **Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

119.   As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

120.   Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members have already and must continue to monitor their financial and personal accounts for many years to mitigate the risk of identity theft.

121.   Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

122.   Plaintiffs' mitigation efforts, which have already begun, are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity

theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

123.   Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

124.   And for those Class Members here who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**<u>Diminution of Value of Private Information</u>**

125.   Private Information is valuable property.[24] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward

---

[22]  *Id.*, PageID.19 at n.25.
[23] *Id.*, PageID.20 at n.26.
[24] *Id.*, at n.27.

analysis illustrates, beyond doubt, that Private Information has considerable market value.

126.   The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach—most notably name—is difficult, if not impossible, to change.

127.   This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[25]

128.   Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[26]

129.   An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[27] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the

---

[25] *Id.* PageID.21 at n.28.
[26] *See id.* at n.29.
[27] *See id.* at n.30.

information and provides it to marketers or app developers.[28,29] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[30]

130.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

131.   The fraudulent activity resulting from the Data Breach may not come to light for years.

132.   Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

133.   HFHS was, or should have been, fully aware of the unique type and the significant volume of data on HFHS's network of individuals' detailed Private

---

[28] *Id.* at n.31.
[29] *Id.* at n.32.
[30] *Id.* at n.33.

Information and, thus, a significant number of individuals would be harmed by the exposure of the unencrypted data.

134.   The injuries to Plaintiffs and Class Members were directly and proximately caused by HFHS's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

## **The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

135.   Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

136.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137.   Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

138.   The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from HFHS's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for HFHS's failure to safeguard their Private Information.

### Loss of the Benefit of the Bargain

139.   Furthermore, HFHS's inadequate data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay, or have paid, HFHS for the provision of its services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, HFHS did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with HFHS.

### The Monetary Value of Privacy Protections and Private Information

140.   The fact that Plaintiffs' and Class Members' Private Information was stolen means that Class Members' information is likely for sale by cybercriminals

and will be misused in additional instances in the future. Indeed, there is already evidence that Plaintiffs' Private Information is on the dark web.

141. At all relevant times, HFHS was well aware that the Private Information it collects from Plaintiffs and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

142. As discussed above, Private Information is a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[31]

143. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[32]

144. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[33]

---

[31] *See* Case No. 2:23-cv-11758 PageID.71 at n.72.
[32] *See id.*, PageID.72 at n.73.
[33] *See id.* at n.74.

39

145.    The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[34]

146.    Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

147.    Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[35]

---

[34] *See id.* at n.75.
[35] *See id.*, PageID.73 at n.76.

148.   As discussed above, the value of Plaintiffs' and Class Members' Private Information on the black market is substantial.

149.   Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment.

150.   The ramifications of HFHS's failure to keep its patients' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

151.   Victims may not realize their identity has been compromised until long after it has happened.[36] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[37]

152.   Breaches are particularly serious in healthcare industries, with healthcare related data among the most private and personally consequential, as set forth above.

---

[36] *See id.*, PageID.74 at n.77.
[37] *See id.* at n.78.

153.   At all relevant times, HFHS was well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

154.   Had HFHS remedied the deficiencies in its security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, HFHS would have prevented the ransomware attack into its systems and, ultimately, the theft of its patients' Private Information.

155.   Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[38] For example, different PII and PHI elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual.[39] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiffs and Class Members that was misused.

---

[38]   *See id.*, PageID.75 at n.80.

[39]   *See id.*

42

156.   In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

157.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information was not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

158.   Given these facts, any healthcare or other type of entity that transacts business with patients or customers and then compromises the privacy of its patients' or customers' Private Information has thus deprived them of the full monetary value of the transaction with the entity.

159.   Plaintiffs and Class Members now face an impending, substantial risk of identity theft and medical insurance fraud.

160.   In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a

variety of unlawful manners, including opening new credit and financial accounts in users' names.

### The Data Breach's Impact on Plaintiffs and Class Members

161.  Plaintiffs obtained medical services from HFHS. To obtain these medical services, they were required to provide their Private Information to HFHS.

162.  Upon information and belief, at the time of the Data Breach—March 30, 2023—HFHS retained Plaintiffs' and Class Members' Private Information in its system.

163.  Plaintiffs are very careful about sharing their sensitive Private Information. Plaintiffs store any documents containing their Private Information in a safe and secure location. Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

164.  Plaintiffs were sent notice of the Data Breach on or about July 14, 2023.[40] According to the HFHS, some of Plaintiffs' information was contained in the employee email boxes affected in the Data Breach, and the information stored on the affected email account may have included Plaintiffs' name, gender, date of birth, age, lab results, procedure type, diagnosis, date of service, telephone number, medical record number and/or internal tracking number.[41]

---

[40]  *See* Notice.
[41]  *See id.*

165.   As a result of the Data Breach, Plaintiffs made reasonable efforts to mitigate the impact of the Data Breach, including checking their bills and accounts to make sure they were correct. Plaintiffs have spent significant time dealing with the Data Breach, valuable time they otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

166.   As a result of the Data Breach, Plaintiffs fear for their personal financial security and uncertainty over what medical information was revealed in the Data Breach. Plaintiffs are experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

167.   As a result of the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

168.   As a result of the Data Breach, Plaintiffs are presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

169.   Plaintiffs have a continuing interest in ensuring that their Private Information, which, upon information and belief, remains in HFHS's possession, is protected and safeguarded from future breaches.

170.   Plaintiffs have suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to: (i) their Private Information being disseminated on the dark web, according to McAfee (Plaintiff King); (ii) an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of their Private Information; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in HFHS's possession and is subject to further unauthorized disclosures so long as HFHS fails to undertake appropriate and adequate measures to protect the Private Information.

**Plaintiffs' Experiences**

***Plaintiff Briana Tabbs***

171.   Subsequent to the Data Breach, and in addition to the injuries alleged above as to all Plaintiffs, Plaintiff Tabbs has expended significant time scouring her accounts for fraudulent activity, and she took the proactive step of freezing her credit in July after learning about the Data Breach.

172.   Plaintiff Tabbs has received a recent increase in spam calls since the period of the Data Breach.

173.   Plaintiff Tabbs spends time every morning examining her credit report and otherwise scanning her accounts for fraudulent activity as a result of the Data Breach.

174.   Plaintiff Tabbs estimates she has spent four hours over the last three months monitoring her accounts for additional fraudulent activity as a result of the Data Breach—the time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Tabbs otherwise would have spent on other activities, such as work and/or recreation.

175.   Plaintiff Tabbs additionally experiences emotional distress and anxiety as a result of the Data Breach knowing that her Private Information is in the hands of cybercriminals.

176.   Plaintiff Tabbs plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

### *Plaintiff Latricia Pelt*

177.   Subsequent to the Data Breach, and in addition to the injuries alleged above as to all Plaintiffs, Plaintiff Pelt has expended significant time reviewing her accounts for fraudulent activity.

178.   Plaintiff Pelt has received a recent increase in spam calls and junk emails since the period of the Data Breach, leading her to put a block on unknown telephone numbers.

179.   Additionally, Plaintiff Pelt has received an alert from Credit Karma that her information has been found on the dark web within the last several months.

180.   Plaintiff Pelt examines her credit report on a daily basis and otherwise scans her accounts for fraudulent activity as a result of the Data Breach.

181.   Plaintiff Pelt estimates that she has spent twenty hours over the last several months monitoring her accounts for additional fraudulent activity as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Pelt otherwise would have spent on other activities, such as work and/or recreation.

182.   Plaintiff Pelt additionally experiences emotional distress and anxiety as a result of the Data Breach knowing that her Private Information is in the hands of cybercriminals.

183.   Plaintiff Pelt plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity and following closely all updates on the present case.

*Plaintiff Brandi McKenzie*

184.   Following the Data Breach, and in addition to the injuries alleged above as to all Plaintiffs, Plaintiff McKenzie has expended significant time reviewing her accounts for fraudulent activity.

185.   Plaintiff McKenzie spends substantial time every week examining her accounts for fraudulent activity as a result of the Data Breach.

186.   Plaintiff McKenzie estimates she has spent five hours over the last three months monitoring her accounts for additional fraudulent activity as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff McKenzie otherwise would have spent on other activities, such as work and/or recreation.

187.   On a daily basis, Plaintiff McKenzie experiences substantial emotional distress and anxiety as a result of the Data Breach. Plaintiff McKenzie further feels like her intimate personal details and privacy has been gravely invaded due to the nature of the PHI at issue here.

188.   Plaintiff plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

*Plaintiff David King*

189.   Following the Data Breach, and in addition to the injuries alleged above as to all Plaintiffs, Plaintiff King has expended significant time reviewing his accounts for fraudulent activity.

190.   Plaintiff King spends substantial time every week examining his accounts for fraudulent activity as a result of the Data Breach.

191.   As a result of the Data Breach, and at the direction of HFHS's Notice, Plaintiff King made reasonable efforts to mitigate the impact of the Data Breach, including contacting HFHS to obtain more details about the Data Breach's occurrence, changing passwords and resecuring his own computer networks, and monitoring his financial accounts for any indication of fraudulent activity, which may take years to detect.

192.   Plaintiff King has spent considerable time over the last three months monitoring his accounts for additional fraudulent activity as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff McKenzie otherwise would have spent on other activities, such as work and/or recreation.

193.   Plaintiff King has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

194.   The Data Breach has caused Plaintiff King to suffer fear, anxiety, and stress, which has been compounded by the fact that HFHS has still not fully informed him of key details about the Data Breach's occurrence.

195.   Plaintiff King plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

196.   If Mr. King had known that HFHS would not adequately protect his Private Information, he would not have entrusted HFHS with his Private Information or allowed HFHS to maintain this sensitive Private Information.

## CLASS ACTION ALLEGATIONS

197.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiffs bring this action on behalf of themselves and on behalf of all members of the proposed Nationwide Class and Michigan Subclass (together, the "Class" or "Classes") defined as:

**Nationwide Class:** All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported to have occurred on or about March 30, 2023.

**Michigan Subclass:** All individuals residing in the state of Michigan whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported to have occurred on or about March 30, 2023.

198.   Excluded from the Class are the following individuals and/or entities: HFHS and HFHS's parents, subsidiaries, affiliates, officers and directors, and any

51

entity in which HFHS has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

199.   Plaintiffs reserve the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

200.   **Numerosity**: The Class Members are so numerous that joinder of all members is impracticable, if not completely impossible. Approximately 168,000 individuals were affected by the of the Data Breach. The Class is apparently identifiable within HFHS's records, as HFHS has sent Notice of the Data Breach to Plaintiffs and other Class Members.

201.   Common questions of law and fact exist as to all Class Members and predominate over any questions affecting solely individual Class Members. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, are the following:

a.   Whether and to what extent HFHS had a duty to protect the Private Information of Plaintiffs and Class Members;

b.   Whether HFHS had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.   Whether HFHS had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

    d.    Whether HFHS failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

    e.    Whether HFHS failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    f.    Whether HFHS adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

    g.    Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of HFHS's wrongful conduct; and

    h.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

202. **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Classes.

203. This class action is also appropriate for certification because HFHS acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. HFHS's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on HFHS's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

204. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

205. **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like HFHS. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

206. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient

and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because HFHS would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

207.   Adequate notice can be given to Class Members directly using information maintained in HFHS's records.

208.   Further, HFHS has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

   a.   Whether HFHS owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;
   b.   Whether HFHS's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;
   c.   Whether HFHS's failure to institute adequate protective security measures amounted to negligence;
   d.   Whether HFHS's failure to institute adequate protective security measures amounted to breach of an implied contract;

e.   Whether HFHS failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.   Whether adherence to HIPAA and FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Michigan Class)**

209.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

210.   HFHS required customers, including Plaintiffs and Class Members, to submit non-public Private Information in the ordinary course of healthcare services.

211.   By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, HFHS owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. HFHS's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

212.   HFHS owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed

herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

213.   Plaintiffs and the Class are a well-defined, foreseeable, and probable group of patients that HFHS was aware, or should have been aware, could be injured by inadequate data security measures.

214.   HFHS owed numerous duties to Plaintiffs and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in its possession;
- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and
- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

215.   A large depository of highly valuable health care information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. HFHS knew or should have known that, given its repository of a host of Private Information for hundreds of thousands of patients posed a significant risk of being targeted for a data breach. Thus, HFHS had a duty to reasonably safeguard its patients' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiffs and the Class of inadequate data security created a duty to act reasonably and safeguard the Private Information.

216.   HFHS's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between HFHS and its patients, Plaintiffs and Class Members, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. HFHS was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

217.   HFHS's duty to use reasonable security measures under HIPAA required HFHS to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

218.   In addition, HFHS has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

219.   HFHS's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also

because HFHS is bound by industry standards to protect confidential Private Information.

220.   HFHS breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by HFHS includes, but is not limited to, the following:

> a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
> b. Failing to adequately monitor the security of their networks and systems;
> c. Failing to ensure that their email system had plans in place to maintain reasonable data security safeguards;
> d. Failing to have in place mitigation policies and procedures;
> e. Allowing unauthorized access to Class Members' Private Information;
> f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and
> g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

221.   It was foreseeable that HFHS's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

222.   HFHS's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the

Private Information and failing to provide Plaintiffs and Class Members with timely notice that their sensitive Private Information had been compromised.

223.   Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in Plaintiffs' Consolidated Amended Complaint here.

224.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members suffered damages as alleged above.

225.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

226.   Plaintiffs and Class Members are also entitled to injunctive relief requiring HFHS to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## SECOND COUNT
### NEGLIGENCE *PER SE*
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Michigan Class)**

227.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

228.   Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, HFHS has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

229.   Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, HFHS had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

230.   Pursuant to HIPAA, HFHS had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

231.   HFHS breached its duties to Plaintiffs and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

232.   HFHS's failure to comply with applicable laws and regulations constitutes negligence per se.

233.   But for HFHS's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

234.   The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of HFHS's breach of its duties. HFHS knew or should have known that it was failing to meet its duties, and that HFHS's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

235.   As a direct and proximate result of HFHS's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### THIRD COUNT
### BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiffs and the Nationwide Class or,
Alternatively, the Michigan Class)**

236.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

237.   Plaintiffs and Class Members entered into implied contracts with HFHS under which HFHS agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members that their information had been breached and compromised.

238.   Plaintiffs and the Class were required to deliver their Private Information to HFHS as part of the process of obtaining services provided by HFHS. Plaintiffs and Class Members paid money, or money was paid on their behalf, to HFHS in exchange for services.

239.   HFHS solicited, offered, and invited Class Members to provide their Private Information as part of HFHS's regular business practices. Plaintiffs and Class Members accepted HFHS's offers and provided their Private Information to HFHS.

240.   HFHS accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services for Plaintiffs and Class Members.

241.   In accepting such information and payment for services, Plaintiffs and the other Class Members entered into an implied contract with HFHS whereby HFHS became obligated to reasonably safeguard Plaintiffs' and the other Class Members' Private Information.

242.   In delivering their Private Information to HFHS and paying for healthcare services, Plaintiffs and Class Members intended and understood that HFHS would adequately safeguard the data as part of that service.

243.   Upon information and belief, in its written policies, HFHS expressly and impliedly promised to Plaintiffs and Class Members that they would only

disclose protected information and other Private Information under certain circumstances, none of which related to a Data Breach as occurred in this matter.

244.   The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

245.   The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

246.   Plaintiffs and Class Members would not have entrusted their Private Information to HFHS in the absence of such an implied contract.

247.   Had HFHS disclosed to Plaintiffs and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs

and the other Class Members would not have provided their Sensitive Information to HFHS.

248.   HFHS recognized that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and the other Class Members.

249.   Plaintiffs and the other Class Members fully performed their obligations under the implied contracts with HFHS.

250.   HFHS breached the implied contract with Plaintiffs and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

251.   As a direct and proximate result of HFHS's conduct, Plaintiffs and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

**FOURTH COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class or,**
**Alternatively, the Michigan Class)**

252.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

253.   This count is pleaded in the alternative to Count 3 (breach of implied contract).

254. Upon information and belief, HFHS funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and Class Members.

255. As such, a portion of the payments made by or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to HFHS.

256. Plaintiffs and Class Members conferred a monetary benefit on HFHS. Specifically, they purchased goods and services from HFHS and/or its agents and in so doing provided HFHS with their Private Information. In exchange, Plaintiffs and Class Members should have received from HFHS the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

257. HFHS knew that Plaintiffs and Class Members conferred a benefit which HFHS accepted. HFHS profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

258. Plaintiffs and Class Members conferred a monetary benefit on HFHS, by paying HFHS as part of rendering medical services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members'

Personal Information, and by providing HFHS with their valuable Personal Information.

259.   HFHS was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, HFHS instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of HFHS's failure to provide the requisite security.

260.   Under the principles of equity and good conscience, HFHS should not be permitted to retain the money belonging to Plaintiffs and Class Members, because HFHS failed to implement appropriate data management and security measures that are mandated by industry standards.

261.   HFHS acquired monetary benefit and Personal Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

262.   If Plaintiffs and Class Members knew that HFHS had not secured their Personal Information, they would not have agreed to provide their Personal Information to HFHS.

67

263.   Plaintiffs and Class Members have no adequate remedy at law.

264.   As a direct and proximate result of HFHS's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their Personal Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in HFHS's possession and is subject to further unauthorized disclosures so long as HFHS fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

265.   As a direct and proximate result of HFHS's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

266.   HFHS should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, HFHS should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for HFHS's services.

### FIFTH COUNT
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Michigan Class)

267.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

268.   In light of the special relationship between HFHS and Plaintiffs and Class Members, HFHS became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) HFHS does store.

269.   HFHS had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its patients, in particular, to keep secure their Private Information.

270.   HFHS breached its fiduciary duty to Plaintiffs and Class Members by failing to diligently discovery, investigate, and give notice of the Data Breach in a reasonable and practicable period.

271.   HFHS breached its fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

272.   HFHS breached its fiduciary duty owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

273.   HFHS breached its fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

274.   As a direct and proximate result of HFHS's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended

and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in HFHS's possession and is subject to further unauthorized disclosures so long as HFHS fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of HFHS's services they received.

275.   As a direct and proximate result of HFHS's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## SIXTH COUNT
### VIOLATIONS OF MICHIGAN'S DATA BREACH PROMPT NOTIFICATION LAW
### (MICH. COMP. LAWS ANN. § 445.72(1), et seq.)
### (On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Michigan Class)

276.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

277.   Defendant is required to accurately and notify Plaintiffs and Class Members if it discovers a security breach, or receives notice of a security breach

(where unencrypted and unredacted Personal Information was accessed or acquired by unauthorized persons), without unreasonable delay under Mich. Comp. Laws Ann. § 445.72(1).

278.   HFHS is a business that owns or licenses computerized data that includes personal information as defined by Mich. Comp. Laws Ann. § 445.72(1).

279.   Plaintiffs and Class Members' personal information (*e.g.*, Social Security numbers) includes personal information as covered under Mich. Comp. Laws Ann. § 445.72(1).

280.   Because HFHS discovered a security breach and had notice of a security breach (where unencrypted and unredacted personal information was accessed or acquired by unauthorized persons), HFHS had an obligation to disclose such in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

281.   HFHS has stated that the Data Breach occurred on March 30, 2023 and that it immediately began an extensive investigation to determine what happened. HFHS also states that it confirmed the breach of Private Information on May 16, 2023. However, HFHS did not notify Plaintiffs and the Class until approximately July 14, 2023, approximately three-and-a-half months after it discovered the Data Breach and two months after it confirmed that Private Information had been compromised.

282.   As a direct and proximate result of HFHS's violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiffs and Class Members suffered damages as set forth herein.

283.   Plaintiffs and Class Members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including, but not limited to, a civil fine of up to $250 for each violation.

## COUNT SEVEN
### BREACH OF CONFIDENCE
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Michigan Class)**

284.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

285.   Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by HFHS and that was ultimately accessed or compromised in the Data Breach.

286.   As a healthcare provider, HFHS has a special relationship to its patients, like Plaintiffs and Class Members.

287.   Because of that special relationship, HFHS was provided with and stored private and valuable PII and PHI belonging to Plaintiffs and the Class, which it was required to maintain in confidence.

288.   Plaintiffs and the Class provided HFHS with their Private Information under both the express and/or implied agreement of HFHS to limit the use and disclosure of such Private Information.

289.   HFHS had a common law duty to maintain the confidentiality of Plaintiffs' and Class Members' Private Information.

290.   HFHS owed a duty to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

291.   Plaintiffs and Class Members have a privacy interest in their personal and medical matters, and HFHS had a duty not to disclose confidential personal and medical information and records concerning its patients.

292.   As a result of the Parties' relationship of trust, HFHS had possession and knowledge of the confidential Private Information of Plaintiffs and Class Members.

293.   Plaintiffs' and the Class's Private Information is not generally known to the public and is confidential by nature.

294.   Plaintiffs and Class Members did not consent to nor authorize HFHS to release or disclose their Private Information to an unknown criminal actor.

295. HFHS breached the duty of confidence it owed to Plaintiffs and Class Members when Plaintiffs' and Class Members' Private Information was disclosed to unknown criminal hackers by way of HFHS's own acts and omissions, as alleged herein.

296. HFHS breached its duties of confidence by failing to safeguard Plaintiffs' and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Breach, and its extent, at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; (h) storing PII, PHI and medical records/information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and

release of Plaintiffs' and Class Members' Private Information to a criminal third party.

297.   But for HFHS's wrongful breach of its duty of confidences owed to Plaintiffs and Class Members, their privacy, confidences, and Private Information would not have been compromised.

298.   As a direct and proximate result of HFHS's breach of Plaintiffs' and the Class's confidences, Plaintiffs and Class Members have suffered or will suffer injuries, including: the erosion of the essential and confidential relationship between HFHS—as a health care services provider—and Plaintiffs and Class Members as patients; loss of their privacy and confidentiality in their Private Information; theft of their Private Information; costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; lowered credit scores resulting from credit inquiries following fraudulent activities; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the HFHS's Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; the imminent and certainly impending injury flowing from

the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; damages to and diminution in value of their Private Information entrusted, directly or indirectly, to HFHS with the mutual understanding that HFHS would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; continued risk of exposure to hackers and thieves of their Private Information, which remains in HFHS's possession and is subject to further breaches so long as HFHS fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by HFHS; and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

299.   Additionally, HFHS received payments from Plaintiffs and Class Members for services with the understanding that HFHS would uphold its responsibilities to maintain the confidences of Plaintiffs' and Class Members' Private Information.

300.   HFHS breached the confidence of Plaintiffs and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for HFHS to retain the benefit at Plaintiffs' and Class Members' expense.

301.   As a direct and proximate result of HFHS's breach of confidences, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT EIGHT
## DECLARATORY RELIEF
### (On Behalf of Plaintiffs and the Nationwide Class or,
### Alternatively, the Michigan Class)

302.   Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

303.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal statutes described in this Complaint.

304.   An actual controversy has arisen in the wake of the Data Breach regarding HFHS's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' Private Information, and whether HFHS is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from future data breaches that compromise their Private Information. Plaintiffs and the Class remain at imminent risk that additional compromises of their Private Information will occur in the future.

305.   The Court should also issue prospective injunctive relief requiring HFHS to employ adequate security practices consistent with law and industry standards to protect consumers' PII and PHI.

306.   HFHS still possesses the Private Information of Plaintiffs and the Class.

307.   HFHS has made no announcement that it has changed its data storage or security practices relating to the storage of Plaintiffs' and Class Members' Private Information.

308.   To Plaintiffs' knowledge, HFHS has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

309.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at HFHS. The risk of another such breach is real, immediate, and substantial.

310.   The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to HFHS if an injunction is issued. Among other things, if another data breach occurs at HFHS, Plaintiffs and Class Members will likely continue to be subjected to a heightened, substantial, imminent risk of fraud, identify theft, and other harms described herein. On the other hand, the cost to HFHS of complying with an injunction by employing reasonable prospective data security

measures is relatively minimal, and HFHS has a pre-existing legal obligation to employ such measures.

311. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at HFHS, thus eliminating the additional injuries that would result to Plaintiffs and Class Members, along with other consumers whose Private Information would be further compromised.

312. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that HFHS implement and maintain reasonable security measures, including but not limited to the following:

    a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on HFHS's systems on a periodic basis, and ordering HFHS to promptly correct any problems or issues detected by such third-party security auditors;

    b. engaging third-party security auditors and internal personnel to run automated security monitoring;

    c. auditing, testing, and training its security personnel regarding any new or modified procedures;

    d. purging, deleting, and destroying Private Information not necessary for its provisions of services in a reasonably secure manner;

    e. conducting regular database scans and security checks; and

    f. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a) For equitable relief enjoining HFHS from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

b) For equitable relief compelling HFHS to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

c) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of HFHS's wrongful conduct;

d) Ordering HFHS to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

e) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

f) For an award of punitive damages, as allowable by law;

g) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h) Pre- and post-judgment interest on any amounts awarded; and,

i) Such other and further relief as this court may deem just and proper.[42]

---

[42] At the appropriate time, Plaintiffs intend to move for an Order certifying this action as a Class action, appointing Plaintiffs as Class Representative, and appointing Interim Class Counsel as Class Counsel in this Action.

## <u>JURY TRIAL DEMANDED</u>

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury

of any and all issues in this action so triable as of right.

Dated: October 13, 2023                     Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Melvin Hollowell (P37834)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
T: (248) 841-2200
epm@millerlawpc.com
mbh@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com

*Interim Lead Counsel for Plaintiffs and
the Proposed Class*

Jonathan Shub
Benjamin F. Johns
Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
T: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

Bart D. Cohen
**BAILEY GLASSER LLP**
1622 Locust Street

Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

William "Billy" Peerce Howard*
**THE CONSUMER PROTECTION
FIRM, PLLC**
401 East Jackson Street, Suite 2340
Truist Place
Tampa, FL 33602
(813) 500-1500
Billy@TheConsumerProtectionFirm.com

Jeff Ostrow
Kristen Lake Cardoso
Steven Sukert
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
cardoso@kolawyers.com
sukert@kolawyers.com

Nick Suciu III (P72052)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878

gklinger@milberg.com

*Attorneys for Plaintiffs and
the Proposed Class*

*admission application forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

<u>/s/ E. Powell Miller</u>
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com